## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        *Plaintiff*,

  vs.

LUIS RAUL RENTERIA-LOPEZ, JUAN
CARLOS GUTIERREZ, FERNANDO
GARCIA-ESCOBAR, and RAMIRO
AVILA,

        *Defendants*.

Case No.10-10152-01, 02, 03, 04-EFM

## MEMORANDUM AND ORDER

The Government has filed a five-count indictment naming the following four individuals as defendants: (1) Luis Raul Renteria-Lopez, (2) Juan Carlos Gutierrez, (3) Fernando Garcia-Escobar, and (4) Ramiro Avila. Among other things, the indictment alleges that Defendants possessed with the intent to distribute a controlled substance. Three of the defendants, Renteria, Gutierrez, and Avila, have filed motions to suppress the statements they made, as well as the physical evidence seized (Docs. 65, 66, 67, 69, & 70). Additionally, Gutierrez has filed a motion for discovery regarding the confidential informant (Doc. 73). A hearing on these motions was held. For the reasons stated below, the Court stays its ruling on Gutierrez's discovery motion and denies Defendants' suppression motions.

## FACTUAL BACKGROUND

Suspecting that Defendant Juan Carlos Gutierrez was trafficking large quantities of methamphetamine, the Wichita Police Department ("WPD"), organized a sting operation. On

September 29, 2010, a WPD confidential informant ("C.I."), who had worked with the WPD a number of times in the past, placed a recorded call to Gutierrez asking Gutierrez to meet him at a carwash so that he could purchase methamphetamine. Gutierrez picked up Defendant Fernando Garcia-Escobar and drove to the agreed-upon location. Once Defendants arrived, an undercover detective displayed a roll of cash to them. Gutierrez and Garcia then drove to Garcia's residence and were met by Defendant Luis Raul Renteria-Lopez. Garcia briefly got into Renteria's vehicle and then returned to Gutierrez's SUV. Gutierrez and Garcia drove back to the carwash.

Once they arrived, Gutierrez and Garcia were approached by the C.I. Once he saw the narcotics, the C.I. gave the code word and Lieutenant Bannister, an eighteen year veteran of the force that is assigned to the Special Investigations Bureau, Undercover Narcotics, who was stationed nearby, signaled to his team of officers to move in and arrest the individuals in Gutierrez's vehicle. During the encounter, a search was performed on Gutierrez's vehicle and a half pound of methamphetamine was discovered. Gutierrez and Garcia were placed into custody and transported to the U.S. Immigration and Customs Enforcement's ("ICE") office.

Following the rendezvous at Garcia's residence, Renteria drove to 1923 North Market, a multi-family residence on which WPD had not conducted surveillance. Detective Gourley of the WPD followed Renteria. Once Bannister met her, which would have been between 4:00 and 4:15 p.m., Gourley and Bannister proceeded to the back of the residence, the location where Gourley had observed Renteria park his vehicle. At the back of the residence, there was a set of stairs that led up to a screen door that had a large glass window and that opened up into a narrow, wood-floored foyer. Inside the foyer, in addition to a small table and an assortment of cleaning supplies and clothes, there were two doors: the door on the left-hand side had a key hole and opened up into the

-2-

residence's living space, while the door on the right side led down to the basement.  Bannister went through the screen door and performed a knock and announce on the door on the left.  While on the back porch, Bannister, smelt a very strong odor of freshly-burnt marijuana, and heard a lot of movement going on inside the residence, including the sound of someone spraying an air freshener.

After no one responded to his knock, Bannister performed a second knock and announce, this time knocking harder.  The more vigorous knock caused the door to swing open.  Bannister, with his gun drawn, stepped through the door and entered the kitchen, where he again announced "police."  While in the kitchen, Bannister made eye contact with Defendant Ramiro Avila and instructed Avila to come to him, which Avila did.  In addition to Avila, Bannister also ordered a female named Monica, who, at the time, was still holding an aerosol spray can, and two small children to exit the house.

Wanting to make sure that there was no one still inside the house capable of destroying evidence or launching an attack against them, Bannister and two other officers performed a full protective sweep of the home and basement.  During the sweep of the basement, officers discovered drug-related items, however, they did not seize them.  Once they completed the sweep, which lasted about three minutes, Bannister asked Avila, who was handcuffed and standing outside, whether officers could search the home.  Avila stated that he had no problem with Bannister's request, but that Bannister would have to ask Monica, Avila's girlfriend, a Spanish speaker, as it was her home.

Bannister next went to the front of the house, where he observed Detective Bieberle of the WPD speaking with Defendant Renteria, Monica's brother, who was unrestrained.  Bieberle informed Bannister that Renteria was the renter on the lease.  Bieberle also told Bannister that Renteria admitted that there was marijuana in the home and that he had consented to a search of the

residence.  However, because Renteria began asking questions about a search warrant, and officers were having a difficult time understanding Renteria, Bannister decided not to search the house at that time.  Instead, at approximately 4:45 p.m., Bannister made a request for a Spanish-speaking officer to be sent to his location to aid officers in determining whether a valid consent had been given.  While waiting for the translator, the officers inputted the identification information that the house's occupants had given to them into their data system, which resulted in the system stating that the information provided was false.

At around 5:20 p.m., WPD Officer Soto, a certified translator, arrived on scene.  Soto spoke in Spanish to both Monica and Renteria.  During the exchange, Monica was standing about five to eight feet away from Renteria.  Soto twice advised Renteria that he had the right not to consent to a search.  Both individuals consented to a search.  Based on this consent, officers searched the home and seized incriminating evidence.  Before the search, no attempt was made to secure a warrant.

Following the search, Monica, Avila, and Renteria were transported to the ICE office, where both Gutierrez and Garcia were also being housed.  While there, all of them were *Mirandized* in Spanish, waived their right to have an attorney present during questioning, and were interviewed by WPD officers.  Initially, Avila requested that an attorney be present, at which point the interviewer stopped her questioning and left the room.  However, Avila later motioned to the interviewer to return, which she did.  Avila then waived his right to an attorney, and was interviewed following a rereading of his *Miranda* rights.  While in ICE custody, Defendants made incriminating statements.

-4-

## ANALYSIS

The motions before the Court can be divided into two categories: the first seeking suppression of incriminating evidence and the second seeking discovery on the C.I. used in this case. The Court will begin by addressing the second category, and then move to the first.

**Motion for Discovery Regarding the Confidential Informant**

In his motion, Gutierrez asks the Court to order the Government to produce discovery regarding the identity and history of the informant used in this case.[1] Gutierrez bases his motion on two grounds: first, that if the government intends to call the C.I. to testify at trial, applicable law mandates that Gutierrez receive discovery, and second, the C.I.'s testimony is relevant to his case and helpful to his defense.

Gutierrez's first basis for discovery fails, as the Government has stated that it does not intend to call the C.I. As for the second, though, it is a much closer call. Typically, "due to the strong public interest in furthering effective law enforcement, the government enjoys a privilege to withhold from disclosure the identity of persons who furnish law enforcement officers with information on criminal acts."[2] However, this privilege may be overcome when the "disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause."[3] In deciding whether to allow discovery, the Court should consider "the possible defenses, the possible significance of the informer's testimony, and other relevant factors."[4]

---

[1]At the hearing, Gutierrez's counsel stated that she was not relying on any of the argument contained in the brief that she filed under seal in support of her motion for discovery (Doc. 81). *See* Doc. 91, p. 159. As a result, the Court only considers the arguments contained in Gutierrez's motion.

[2]*United States v. Vincent*, 611 F.3d 1246, 1251 (10th Cir. 2010) (internal quotation marks omitted).

[3]*Roviaro v. United States*, 353 U.S. 53, 60-61 (1957).

[4]*United States v. Mendoza-Salgado*, 964 F.2d 993, 1000 (10th Cir. 1992).

The burden of demonstrating that disclosure is necessary is on the defendant.[5]  A defendant's mere speculation that disclosure would be helpful is not enough.[6]

Here, based on the role that the C.I. played in the transaction, the Court believes that the most prudent course is to have an *in camera* hearing before deciding the motion.[7]  Having a hearing will allow the Court to assess whether the informant could possibly provide any non-cumulative testimony that would be helpful to a material issue or defense regarding Gutierrez's innocence or guilt.  Therefore, the Government and the confidential informant shall present themselves to the Court's chambers on September 19, 2011, at 3:30 p.m., for an *in camera* hearing on this matter.

**Motions to Suppress the Physical Evidence Seized and Statements Made**

Defendants contend that both the physical evidence seized and incriminating statements made must be suppressed because they were obtained in violation of Defendants' fourth and fifth amendment rights.  The Court will deal with these two contentions in turn.

### A.  Physical Evidence Seized

In this case, physical evidence was seized from two locations: Defendant Gutierrez's vehicle and the residence at 1923 North Market.  Gutierrez argues that the evidence seized from his vehicle, i.e., the half-pound of methamphetamine, must be excluded because WPD officers lacked probable cause and a warrant to search his SUV.  Both of Gutierrez's arguments may be quickly dispatched of.  First, in light of the fact that the C.I. set up the transaction, Gutierrez arrived at the buy site as

---

[5]*See, e.g., Vincent*, 611 F.3d at 1251.

[6]*See, e.g., United States v. Leahy*, 47 F.3d 396, 398 (10th Cir. 1995).

[7]*See, e.g., United States v. Folsom*, 2001 WL 789261, at *9 (D. Kan. June 12, 2001) (adopting this course in a case similar to this one).

scheduled, and the C.I. gave the code word indicating that narcotics were present shortly after meeting Gutierrez, officers had probable cause to search Gutierrez's SUV.[8]  Second, the 'automobile exception' to the warrant requirement permits law enforcement officers who have 'probable cause to believe a car contains contraband [to] search the car without first obtaining a search warrant.' "[9] Therefore, the evidence seized from Gutierrez's SUV should not be suppressed.

With regard to Defendants' argument relating to the evidence seized from 1923 North Market, it too fails.  In their briefing, Defendants contend that this evidence should be suppressed because it is the fruit of three illegal intrusions by WPD officers: (1) Bannister's entry into the foyer; (2) Bannister's breach of the interior door's threshold and protective sweep, and (3) the officer's search of the home.  After reviewing the evidence presented and the applicable law, the Court disagrees that any of the challenged entries violated the fourth amendment, and thus finds that Defendants' request to exclude the evidence seized from the residence should be denied.

To begin with, Defendants do not have a legitimate expectation of privacy in the foyer. While neither this Court nor the Tenth Circuit has developed a standard for determining whether an individual has a protected interest in an enclosed room attached to a residence, guidance on the issue can be found in decisions rendered by state supreme courts.  First, in *State v. Kitchen*[10], the North Dakota Supreme Court instructed that, when deciding whether an unconstitutional intrusion has occurred, courts are to look at "particular characteristics of the home in question."[11]  Second, in *State*

_____

[8]*See, e.g., United States v. Allen*, 353 F. App'x 352, 354-55 (11th Cir. 2009); *United States v. Williams*, 534 F.3d 980, 984 (8th Cir. 2008); *United States v. Rodriguez*, 414 F.3d 837, 843 (8th Cir. 2005).

[9]*United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008) (quoting *United States v. Beckstead*, 500 F.3d 1154, 1165 (10th Cir. 2007) (alteration in original).

[10]572 N.W.2d 106 (N.D. 1997).

[11]*Id.* at 109.

*v. Clark*[12], the Idaho Supreme Court stated that an individual does not have a reasonable expectation of privacy in areas that are "impliedly open to public use," such as access routes to a house.[13]  Based on these decisions, as well as others, the Court believes that, in a case such as this, the determination of whether an individual's fourth amendment rights have been violated hinges upon whether the totality of the circumstances reveal that it was reasonable to expect that an ordinary visitor would have entered the area that the officers did in order to gain access to the entrance of the residence.

Here, considering the evidence as a whole, the Court finds that it was reasonable to expect that an ordinary visitor would enter the foyer to knock on the interior door.  First, the rear of the residence, which is where Gourley saw Renteria park his vehicle, was accessible without impediment,[14] and there was no indication that the residents of the home desired to keep others out of that location.[15]  Second, there was no doorbell outside the screen door leading to the foyer nor was there a large landing.[16]  Third, there was no solid door behind the screen door.  Fourth, while there was a small table and an assortment of cleaning supplies and cloths in the wood-floored foyer, there was nothing in the room that would reasonably suggest to a visitor that the space was not intended

---

[12]859 P.2d 344 (Idaho 1993).

[13]*Id.* at 349.

[14]*See, e.g., United States v. Raines*, 243 F.3d 419, 421 (8th Cir. 2001) (stating that the officer "did not interfere with [the defendant's] privacy interest when he, in good faith, went unimpeded to the back of [the defendant's] home to contact the occupants of the residence").

[15]*Compare with State v. Kochel*, 744 N.W.2d 771, 774 (N.D. 2008) (stating that "[a]ny uncertainty that the addition is an integral part of the home where privacy is reasonably expected is removed by the presence of the [no hunting or trespassing sign posted on the steps outside of the home]").

[16]*See, e.g., State v. Kennedy*, 2002 WL 984515, at *3 (Iowa Ct. App. May 15, 2002) (stating that the defendant did not have a legitimate expectation of privacy in his enclosed front porch because, among other things, there was no doorbell outside the door to the front porch); *People v. Tierney*, 703 N.W.2d 204, 217 (Mich Ct. App. 2005) (same); *compare with United States v. Wilson*, 2009 WL 905709, at *6 (N.D. Iowa Mar. 30, 2009) (relying on the fact that a door bell and a "relatively large wooden landing" were on the outside of the storm door in reaching its conclusion that the defendant had a protected interest in the mudroom that the police entered).

to be used as an entryway.[17]  Therefore, in light of these facts, the Court concludes that Defendants

do not have a legitimate expectation of privacy in the foyer, and that, as a result, Bannister did not

violate their constitutional rights when he entered that space.

The fact that Bannister was lawfully in the foyer is significant.  Before entering that area,

Bannister likely lacked probable cause to search the residence, as he did not have any idea what

Renteria's relationship was to the property,[18] and he had no basis, other than Renteria's mere

presence, to believe that the house, which had not had surveillance on it, contained contraband.[19]

However, once he was in the foyer, Bannister, an eighteen-year veteran of the force and a member

of the WPD's narcotic unit, was able to smell the burning of marijuana and hear a lot of commotion

and the sound of an aerosol can being sprayed inside the residence.  These observations, which

Bannister could legally make,[20] coupled with the fact that officers had observed Renteria meet with

Garcia immediately before narcotics were discovered in Gutierrez's vehicle, provided Bannister with

---

[17]*See, e.g., People v. Arias*, 535 N.E.2d 89, 92 (Ill. Ct. App. 1989) (holding that an enclosed porch that the defendant described as a "storage space for furniture and other things which were not being used" did not possess the characteristics concomitant to the home); *Kennedy*, 2002 WL 984515, at *3 (citing the fact that the enclosed porch did not have any furniture or anything of great value as support for its determination that the front porch was merely an entryway not deserving of fourth amendment protection); *State v. Orr*, 2008 WL 940778, at *3-4 (Kan. Ct. App. Apr. 4, 2008) (stating that the defendant's enclosed porch, which housed plastic chairs commonly used as lawn furniture, was nothing more than an entryway); *Tierney*, 703 N.W.2d at 702-04 (finding that the enclosed porch was an entryway even though it contained a dishwasher and other pieces of personal property); *State v. Edgeberg*, 524 N.W.2d 911, 915 (Wis. Ct. App. 1994) (concluding that the enclosed porch was an entryway despite the fact that it contained a washer and dryer and work clothes).

[18]*See, e.g., United States v. Flores*, 679 F.2d 173, 175 (9th Cir. 1982) ("[A] suspect's mere presence or arrest at a residence is too insignificant a connection with that residence to establish [a reasonable inference that the residence likely contains contraband].")*, cert. denied*, 459 U.S. 1148 (1983).

[19]*See, e.g., United States v. Biglow*, 562 F.3d 1272, 1280 (10th Cir. 2009) (stating that in order for there to be probable cause to search a home the known facts must be capable of creating a reasonable inference that evidence of criminal activity will be found therein).

[20]*See, e.g., United States v. Montes-Ramos*, 347 F. App'x 383, 390 (10th Cir. 2009) ("The plain view doctrine is equally applicable to plain smells, such that no search occurs if a police officer detects an odor of illegal drugs, alcohol, chemicals or the like from a location in which he is entitled to be.").

-9-

probable cause to believe that evidence of illegal activity was present in the home.[21]  Additionally,

these facts, in conjunction with the fact that no one responded to his knock, reasonably led Bannister

to believe that exigent circumstances existed, i.e., that there were individuals harbored inside the

home that were capable of injuring him and his officers and/or destroying incriminating evidence

if action was not taken.[22]

Based on the exigent circumstances, Bannister was legally entitled to take a number of

actions.  First, he could enter the residence.[23]  Second, he could perform a protective sweep.[24]  Third,

---

[21]*See, e.g., Johnson v. United States*, 333 U.S. 10, 13 (1948) (stating that the odor of a burning controlled substance "might very well be found to be evidence of most persuasive character" in finding probable cause to issue a search warrant); *United States v. Cephas*, 254 F.3d 488, 495 (4th Cir. 2001) ("[A strong smell of marijuana] alone would almost certainly have given [the officer] probable cause to believe that contraband – marijuana – was present in the apartment."); *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) ("There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana."); *United States v. Montano-Lopez*, 1990 WL 66499. at *2 (9th Cir. May 18, 1990) ("At this point, there was probable cause to enter because the smell of marijuana establishes probable cause."); *State v. Hughes*, 607 N.W.2d 621, 627 (Wis. 2000) ("When the strong smell of marijuana is in the air, there is a 'fair probability' that marijuana is present.  This is common sense."); *Gompf v. State*, 120 P.3d 980, 986 (Wyo. 2005) ("[Once they smelled burnt marijuana], the officers had probable cause to justify issuance of the search warrant.").

[22]*See, e.g., United States v. Reed*, 318 F. App'x 774, 776 (11th Cir. 2009) (stating that the officers' observation of a nearby marijuana field, the smell of marijuana burning, and the sound of somebody running around inside the home established an exigent situation); *United States v. Floyd*, 247 F. App'x 161, 167 (11th Cir. 2007) (finding that exigent circumstances existed in a case where the defendant was a known drug dealer, the smell of burning marijuana emanated from the defendant's house, and there were multiple occupants of the house); *United States v. Scroger*, 98 F.3d 1256, 1259-60 (10th Cir. 1996) (holding that the following evidence justified the officers' warrantless entry into the defendant's home: (1) the defendant was holding a hot plate, which is commonly used in manufacturing methamphetamine; (2) the defendant's fingertips were stained rust-colored, which is commonly the result of handling red phosphorous, an ingredient in methamphetamine production; and (3) there was a strong odor of methamphetamine production coming from the defendant's residence); *United States v. Carr*, 939 F.2d 1442, 1446-49 (10th Cir. 1991) (concluding, based on the fact that an informant had told officers that a kilo of cocaine was present in the defendant's hotel room, that the defendant shut his hotel room door in the plain -clothed officer's face, that officers smelled a strong odor of phencyclidine while the door was open, and that there was a lot of commotion once the door was shut, that exigent circumstances existed sufficient to justify a warrantless entry).

[23]*See, e.g., United States v. Aquino*, 836 F.2d 1268, 1273 (10th Cir. 1988) ("Our cases indicate that the sale of illegal drugs is a sufficiently severe offense to justify a warrantless entry when police 'have reason to believe that criminal evidence' will be destroyed if they do not immediately enter the premises." (quoting *United States v. Cuaron*, 700 F.2d 582, 586 (10th Cir. 1983))).

[24]*See, e.g., United States v. Walker*, 474 F.3d 1249, 1254 (10th Cir. 2007) (stating that a protective sweep can be justified on two grounds: first, incident to an arrest, and second, when exigent circumstances exist); *Scroger*, 98 F.3d at 1260 (upholding the officers' protective sweep of the defendant's home on the ground that an exigent situation

he could order the occupants out of the residence and detain them during the pendency of the sweep.[25]  Fourth, following the discovery of drug-related items during the cursory, limited-in-scope sweep, Bannister and the other officers could detain Defendants for a reasonable amount of time as they took the next steps in their investigatory process.[26]  Therefore, because it concludes that WPD officers did not exceed the parameters of what the law allows them to do, the Court finds that the WPD did not violate Defendants' rights by entering the residence and performing a protective sweep, removing Defendants from the residence, and detaining Defendants until a translator arrived.

Additionally, the Court finds that the WPD validly entered the residence at 1923 North Market to perform a search.  Warrantless searches of homes are permissible if the Government shows that the search was consensual.[27]  In this case, Defendants claim that the search in question was infirm for three reasons: (1) WPD officers never attempted to secure a search warrant; (2) Bannister went consent shopping after Defendant Avila gave an ambiguous response to his question; and (3) that Defendants' consent was not voluntarily given.

---

existed); *Carr*, 939 F.2d at 1448 (same); *United States v. Aquino*, 836 F.2d 1268, 1273 (10th Cir. 1988) (affirming the denial of the defendant's suppression motion because the reasonable fear that the defendant would destroy evidence justified the warrantless entry); *see also Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) ("As *Payton* makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.").

[25]*See United States v. Maddox*, 388 F.3d 1356, 1362-63 (10th Cir. 2004) (declaring that officers may detain individuals that are present at the time that the protective sweep occurs).

[26]*Cf. Illinois v. McArthur*, 531 U.S. 326, 329 (2001) (concluding that the officers' detention of the defendant on his front porch for two hours while they sought a search warrant was reasonable); *Carr*, 939 F.2d at 1446-49 (finding that the officers had acted reasonable in securing the defendants for approximately two hours while a search warrant was obtained).

[27]*See, e.g., U.S. v. Cos.*, 498 F.3d 1115, 1124 (10th Cir. 2007).

In support of their first argument, Defendants cite to *United States v. Aquino*[28].  There, officers stormed into a home and performed a protective sweep approximately an hour-and-a-half after discovering that there was a fair probability that it contained cocaine.[29]  On appeal, the defendant argued that the officers' warrantless entry was unconstitutional because it was nonconsenual and exigent circumstances did not exist.  The Tenth Circuit disagreed, stating that because the officers had a reasonable basis to believe that the defendant would destroy his cocaine before the officers could secure a search warrant that the officers' actions were justified.  In its opinion, though, the *Aquino* panel did express its displeasure with law enforcement's decision to not start the search warrant process immediately after learning that it was likely that the residence contained narcotics.[30]

Defendants' reliance on *Aquino* is misplaced for at least two reasons.  First, *Aquino* does not mandate suppression of the evidence in cases where officers fail to start the warrant process.  While it is true that the *Aquino* panel did admonish the officers for failing to seek a warrant before entering, it stopped short of adopting a *per se* rule.  In the cases following *Aquino* there has been no indication that such a rule has evolved; in fact, subsequent cases, both in this Circuit and others, show just the

---

[28]836 F.2d 1268.

[29]*Id.* at 1270.

[30]*See id.* at 1273-74.

-12-

opposite.[31]   Therefore, *Aquino* does not demand that the incriminating evidence in this case be suppressed merely because the WPD did not seek a warrant.

Second, to the extent that it can be interpreted to stand for the principle that suppression should occur when officers purposely fail to seek a warrant in order to manipulate or abuse the circumstances of the case, *Aquino* still does not require suppression.  To begin with, the officers here lacked probable cause when they approached Defendants' residence.  Thus, the officers' failure to seek a warrant before approaching the home does not suggest an intent to manipulate.  Furthermore, the officers in this case conducted only a minimal protective sweep once they entered the home, careful not to look in spaces not capable of housing a person.  Lastly, the officers' decision to continue to speak with Defendants, as opposed to seek a search warrant, appears to have been motivated by the officers' desire for clarification on whether consent had been given, not to gain an unfair advantage.  As a consequence, the Court finds that there is no basis here for it to find that the officers acted unconstitutionally.

With regard to Defendants' second argument, it too fails.  Simply put, the evidence presented does not support Defendants' theory that Bannister engaged in the manipulative practice of consent shopping in order to frustrate Defendants' rights.  This theory fails because it is based on the faulty

---

[31]*See, e.g., United States v. Gordils*, 982 F.2d 64, 70 (2d Cir. 1992) ("The agents' failure to obtain a search warrant at the earliest possible time did not bar them from acting on the exigent circumstances that arose after they arrested Gordils."); *United States v. Gonzalez*, 967 F.2d 1032, 1034 (5th Cir. 1992) ("In any event, the reasonableness of a search under exigent circumstances is not foreclosed by the failure to obtain a warrant at the earliest practicable moment."); *Carr*, 939 F.2d at 1448 (refusing to suppress the evidence in a case where officers could have obtained a search prior to entering the defendant's hotel room).  The Court is cognizant of the fact that the *Aquino* panel stated "[w]e have also stressed that when a telephone warrant procedure is available, police must exploit it."  836 F.2d at 1272.  However, this statement was dicta, as it was not necessary to the panel's holding.  Therefore, in light of this fact, and the state of the existing case law, the Court declines to suppress the evidence against Defendants based on the officers' failure to exploit the telephone warrant procedure.  *See Bates v. Dep't of Corr. of Kan.*, 81 F.3d 1008, 1011 (10th Cir. 1996) ("[A] panel of this Circuit is bound by a holding of a prior panel of this Court but is not bound by a prior panel's *dicta*." (emphasis in original)).

premise that Defendant Avila's response to Bannister's request was ambiguous or suggested that he was opposed to a search of the home. At the hearing, Bannister testified that, when asked, Avila stated that he had no problem with the search, but that Bannister would have to ask Monica because it was her house. Based on this credible, unrebutted testimony, the Court finds that Bannister's decision not to engage Avila further following their initial conversation was motivated by his belief that Avila lacked the necessary authority to consent to a search, not a desire to avoid a possible objection. Thus, even if the law mandates suppression when officers avoid contact with one of the resident's present occupants for a nefarious reasons, which the Court is skeptical it does,[32] suppression is not warranted here because there is no evidence suggesting that law enforcement had any reason to dodge Avila. As a result, law enforcement's decision to focus solely on Monica and Defendant Renteria cannot serve as a ground to suppress the incriminating evidence.

Defendant's last argument also lacks legal traction. In order for a consensual search to be valid, the Government must show that the consent was given freely and voluntarily.[33] "The question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances."[34] Relevant considerations

> include physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an official reads a defendant his Miranda rights, obtains

---

[32]*See, e.g., United States v. Elam*, 441 F.3d 601, 604 (8th Cir. 2006) (concluding that the intentional-bypass theory only applies when officers ignore a present occupant who is *actively objecting*, not when the officers merely fail to ask the occupant for his consent).

[33]*See, e.g., United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007).

[34]*Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.[35]

Here, considering the evidence as a whole, the Court concludes that Monica and Renteria freely and voluntarily gave their consent to search.[36]  First, following the initial entry and removal of Avila and Monica, which likely occurred over an hour before Monica and Renteria consented to a search, there was no show of force or use of an aggressive tone by the WPD.[37]  Second, while the officers' encounter with Monica and Renteria was more than momentary, nothing about the encounter suggests that it was coercive, as both individuals were allowed to stay on the premises and were unrestrained.[38]  Third, the officers never stated to Monica or Renteria that they would just get a search warrant if Monica and Renteria did not consent.[39]  Fourth, the officer who secured the consent, Officer Soto, spoke with Monica and Renteria in their native tongue, thus eliminating any possibility that they did not understand the request made.  Fifth, although the officers did not

---

[35]*United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006).

[36]The Court addresses only these individuals' consent, and not Avila's, because the officers reasonably believed that Monica and Defendant Renteria possessed the right to consent to a search, the officers relied solely on this consent, and there is positively no evidence that the officers removed Avila from the scene because there were afraid he may object to a search.  *See, e.g., United States v. Ayoub*, 498 F.3d 532, 537-40 (6th Cir. 2007) (stating that one occupant's consent to a search, assuming that the officers reasonably believe that that occupant has authority over the premises, is enough to justify a warrantless entry " '[s]o long as there is no evidence that the police have removed [a] potentially objecting tenant from the entrance for the sake of avoiding a possible objection.' " (quoting *Georgia v. Randolph*, 547 U.S. 103, 121 (2006))); *see also United States v. Alcantar*, 271 F.3d 731, 737 n.7 (8th Cir. 2001) (declaring that, even if the defendant's consent was not consensual, the search in question was valid because the driver of the car consented to the search and the defendant did not object).

[37]*See, e.g., United States v. Sandoval-Vasquez*, 435 F.3d 739, 744 (7th Cir. 2006) (upholding the district court's finding that the consent in question was voluntarily given, despite the fact that the officers, with their firearms drawn, had removed the defendant from his building approximately forty minutes before he consented to a search).

[38]*See, e.g., United States v. Cruz-Mendez*, 467 F.3d 1260, 1267 (10th Cir. 2006) (affirming the district court's denial of the defendant's motion to suppress, and stating that the thirty-minute detention of the consenting individual "was not the equivalent of a lengthy interrogation in a bare room while the subject sits on a stool until her will is overborne" because that individual was in her apartment and unrestrained).

[39]*Cf. id.* (suggesting that such a threat may be evidence of coercion).

-15-

*Mirandize* either of the individuals, Officer Soto, on two occasions, did inform Renteria, while Monica was only five to eight feet away, that he did not have to consent to a search.[40]  Sixth, there is no indication that either of the two people were not of sound mind at the time that their consent was secured.  Therefore, in light of the totality of the circumstances, and despite the fact that there were numerous officers at the scene and that Monica and Renteria likely were not free to end the encounter, the Court finds that Monica's and Renteria's consent was valid.[41]  As a consequence, the officers were justified in entering the residence and performing a search.

### B.  Incriminating Statements

In their briefing, Defendants claim that the incriminating statements that they made at the ICE office must be suppressed for the following three reasons: (1) the statements were the direct result of the unlawful search of the residence at 1923 North Market; (2) the statements were the direct result of the unlawful search of Avila's truck; (3) the statements were the direct result of unlawful, pre-*Miranda* custodial interrogations; and (4) Defendants did not knowingly, intelligently and voluntarily waive their *Miranda* rights.  The Court makes short shrift of each of these arguments.

First, as set forth above, the officers' conduct at 1923 North Market did not violate Defendants' constitutional rights.  Second, Defendants were not taken to the ICE office because of the Mexican driver license allegedly discovered in Avila's vehicle or responses to unconstitutional

---

[40]*See, e.g., United States v. Arciniega*, 569 F.3d 394, 399 (8th Cir. 2009) (*Miranda* warning is not required to establish voluntariness); *United States v. Gutierrez*, 221 F. App'x 446, 449 (7th Cir. 2007) (same); *United States v. Torres-Sanchez*, 83 F.3d 1123, 1130 (9th Cir. 1996) (same).

[41]*See United States v. Romero*, 247 F. App'x 955, 963 (10th Cir. 2007) (" 'Consent to search may be voluntary, even though the consenting party is being detained at the time consent is given.' " (quoting *United States v. Doyle*, 129 F.3d 1372, 1377 (10th Cir. 1997))); *United States v. Iribe*, 11 F.3d 1553, 1557 (10th Cir. 1993) (concluding that the presence of five officers did not mandate a finding that the consent was involuntary).

inquiries; rather, they were taken into custody and moved to the ICE office because of evidence discovered as a result of lawful police conduct, namely the seizure of drug-related items at the residence and the fact that Defendants had given law enforcement false names.[42]  Third, the Court finds no merit to Defendants' charge that their waivers of their *Miranda* rights were not knowingly, intelligently, and voluntarily made.[43]  Nothing in the record suggests that Defendants were incapable of sufficiently comprehending what rights they were waiving.  Further, there is absolutely no indication that Defendants' waivers were the consequence of coercive or manipulative police practices.  Accordingly, the Court concludes that the incriminating statements made by Defendants may be used by the Government.

In sum, the Court finds that none of the evidence procured by the WPD on September 29 should be suppressed.  As a result, Defendants' motions should be denied.

**IT IS THEREFORE ORDERED** that Defendant Gutierrez's motion to compel for discovery regarding the confidential informant (Doc. 73) is hereby taken under advisement pending an *in camera* hearing.

**IT IS FURTHER ORDERED** that Defendant Gutierrez's motion to suppress statements (Doc. 65) is hereby DENIED.

**IT IS FURTHER ORDERED** that Defendant Renteria's motion to suppress search of residence (Doc. 66) is hereby DENIED.

---

[42]*See, e.g., United States v. Lara-Garcia*, 478 F.3d 1231, 1235 n.3 (10th Cir. 2007) ("Undoubtedly, where a suspect such as Defendant is detained based on probable cause that he may have committed a crime, a law enforcement official may ask the suspect to identify himself without providing a *Miranda* warning.").

[43]During the hearing, Gutierrez testified that he too requested an attorney, but was denied.  The Court does not find this testimony credible.  First, the taped recording of the interview does not reveal that such a request was made.  Second, Gutierrez's claim that he asked for an attorney while the recorder was off is too incredible to be believed.  As a result, the Court concludes that Gutierrez, like the other defendants, waived his *Miranda* rights.

-17-

**IT IS FURTHER ORDERED** that Defendant Renteria's motion to suppress statements (Doc. 67) is hereby DENIED.

**IT IS FURTHER ORDERED** that Defendant Avila's motion to suppress evidence and statements (Doc. 69) is hereby DENIED.

**IT IS FURTHER ORDERED** that Defendant Gutierrez's motion to suppress search and seizure of evidence (Doc. 70) is hereby DENIED.

**IT IS SO ORDERED**.

Dated this 2nd day of September, 2011.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE